## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CHARLES CLINE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 22-CV-0314-CVE-CDL |
| ) | |
| CLINICAL PERFUSION SYSTEMS, INC., ) | |
| ET AL. ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Before the Court are defendants Clinical Perfusion Systems, Inc. (CPS), Kevin Esau, and Tyler McKeon's motion to dismiss the amended complaint (Dkt. # 11), plaintiff Charles Cline's response (Dkt. # 19), and defendants' reply (Dkt. # 20). This case arises from plaintiff, a former employee of defendants, alleging in an amended complaint violations of the Rehabilitation Act (count 1), the Oklahoma Anti-Discrimination Act (count 2), the Affordable Care Act (count 3), and breach of contract (count 4) against defendant Clinical Perfusion Systems, Inc. Dkt. # 8. In addition, plaintiff alleges tortious interference (count 5) and outrageous conduct (count 6) against defendants Esau and McKeon. Id.

### I.

On July 19, 2022, plaintiff filed his original complaint (Dkt. # 2), in this Court. On July 28, 2022, plaintiff filed an amended complaint (Dkt. # 8), as a matter of right pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure. The original complaint alleged the same counts 1-6 that are recited above. The amended complaint changed only some of the facts describing plaintiff's medical

condition and treatment.[1]  On August 11, 2022, defendants moved to dismiss all claims of the amended complaint pursuant to Fed R. Civ. P. 12(b)(6).[2]  Dkt. # 11, at 6.

The following facts are taken from the amended complaint:  plaintiff is a perfusionist (Dkt. # 8, at 3), which is a "licensed medical professional who is a member of a cardiovascular surgical team."  Dkt. # 8, at 2.  Perfusionists "operate[] . . . heart-lung machine[s], and during surgery maintain[] blood flow to the patient's tissues and regulate[] levels of oxygen and carbon dioxide in the blood."  Id.  Defendant CPS hired plaintiff as a perfusionist in 2017, where we worked until he was terminated on May 3, 2021.  Id. at 3, 4.  Defendants Esau and McKeon are perfusionists who own CPS.  Id. at 3.

On March 27, 2021, plaintiff lost consciousness while driving, due to a sudden onset of hypotension.  Id. at 3.  Emergency medical personnel responded to the scene and performed emergency care, which included intubating plaintiff, and then transported plaintiff to Saint Francis Hospital in Tulsa.  Id. at 3.  The intubation caused "profound damage to [plaintiff's] throat," which "necessitated treatment in ICU from March 27, 2021, until May 3, 2021, followed by in-patient rehabilitation at an . . . [LTAC] until June 11, 2021, when he was discharged."  Id.  Due to the

---

[1]    The amended complaint adds details about plaintiff's treatment and ailments.  Dkt. # 8, at 3, 4.  It also clarifies the nature of the long term acute care (LTAC), the rehabilitation facility where plaintiff received treatment (id. at 3), the treatment received while at LTAC (id. at 5), and when plaintiff was discharged from that facility (id. at 5).  The only other substantive modification is that the amended complaint alleges, as part of the OADA claim, that plaintiff's physical impairments were "non-transitory" and "non-minor"  Id. at 11.  This assertion had already been stated as part of the Rehabilitation Act claim, which states that plaintiff's "physical impairments were neither transitory nor minor."  Id. at 7; Dkt. # 2, at 6.

[2]    Defendants also move to dismiss plaintiff's amended complaint pursuant to Fed. R. Civ. P. 12(b)(3); however, defendants' brief in support addresses only failure to state a claim deficiencies under Rule 12(b)(6), and not improper venue under Rule 12(b)(3).  Therefore, the Court considers defendants' motion under only Rule 12(b)(6).

necessary treatment of his damaged throat, plaintiff could breathe only with the assistance of a ventilator attached to a tracheostomy cannula for most of his stay in the ICU.  Id. at 3.  While in the ICU, plaintiff also used a Foley catheter and had a gastric feeding tube, and his kidneys became compromised for which he underwent dialysis for approximately six weeks.  Id.  Plaintiff was "heavily sedated and slept up to twenty [] hours each day."  Id.  Because of the "condition of his throat, kidneys, and other organs, [plaintiff] could not speak, eat . . . , or care for himself.  Id.

Defendants Esau and McKeon "observed plaintiff in [the] ICU," spoke with plaintiff's wife, Nicole Pardini, and "formed certain opinions about his condition."  Id. at 4.  On May 3, 2021, defendants Esau and McKeon informed Pardini by telephone that plaintiff was being terminated due to CPS's financial condition.  Id. at 4.  "When [CPS] made the decision to discharge Cline, the expected duration of the impairments was more than six (6) months."  Id. at 7.  Pardini asked the defendants "whether they would agree to hold [plaintiff's] job open until he recovered," but defendants Esau and McKeon declined her request.  Id. at 4.  Plaintiff "was the only employee who was terminated by [CPS] in 2021."  Id. at 5.  When CPS decided to terminate plaintiff, it "had recently hired or was in the process of hiring two (2) individuals as perfusionists, each of whom was far younger . . . and . . . far less qualified and far less experienced than [plaintiff.]"  Id. at 11.  One or both of these new hires replaced plaintiff at CPS.  Id.

That same day, May 3, 2021, plaintiff was transferred to LTCA where he "received rehabilitation services and continued dialysis."  Id. at 5.  While at LTCA, plaintiff continued to receive extensive services and was "unable to work or care for himself."  Id. at 5.  Plaintiff was discharged from LTCA on June 11, 2021, but continued to use his "tracheostomy cannula, his gastric tube, and his catheter" "for a few weeks."  Id. at 5.  On July 28, 2021, plaintiff's physician "released

[plaintiff] to return to work as a perfusionist on a full-time basis without restriction." Id. at 5. "Shortly after" being released to work, plaintiff asked defendant McKeon for reinstatement and "even offered to work at a lesser position," but plaintiff's request was denied. Id. at 5.

Plaintiff subsequently obtained employment as a perfusionist in California. Id. at 5. Despite ongoing difficulty and pain when speaking or swallowing, plaintiff "is able to work full-time as a perfusionist." Id. at 5-6.

## II.

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted. A motion to dismiss is properly granted when a complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A complaint must contain enough "facts to state a claim to relief that is plausible on its face" and the factual allegations "must be enough to raise a right to relief above the speculative level." Id. (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 562. Although decided within an antitrust context, Twombly "expounded the pleading standard for all civil actions." Ashcroft v. Iqbal, 556 U.S. 662, 683 (2009). For the purpose of making the dismissal determination, a court must accept all the well-pleaded allegations of the complaint as true, even if doubtful in fact, and must construe the allegations in the light most favorable to the claimant. Twombly, 550 U.S. at 555; Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007); Moffett v. Halliburton Energy Servs., Inc., 291 F.3d 1227, 1231 (10th Cir. 2002). However, a court need not accept as true those allegations that are conclusory in nature. Erikson v. Pawnee Cnty. Bd. Of Cnty. Comm'rs, 263

4

F.3d 1151, 1154-55 (10th Cir. 2001).  "[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." Hall v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir. 1991).

### III.

Rehabilitation Act Claim (Count One)

Plaintiff's first claim for relief (count one) is that CPS failed to accommodate his disability and that he was terminated because of his disability in violation of the Rehabilitation Act.  Dkt. # 8, at 9.  Defendants argue that plaintiff cannot state a plausible claim for disability discrimination under the Rehabilitation Act, because he cannot show that he was an "otherwise qualified" person with a disability.  Dkt. # 11, at 7.

"Section 504 of the Rehabilitation Act provides that 'no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'"  Cohon ex rel. Bass v. New Mexico, 646 F.3d 717, 725 (10th Cir. 2011) (quoting 29 U.S.C. § 794(a)).  To state a prima facie case for discrimination under section 504, plaintiff must show (1) that he is a disabled individual under the Rehabilitation Act; (2) that he is "otherwise qualified" apart from his handicap, "i.e., with or without reasonable accommodation, [he] could perform the job's essential functions;" (3) that his employer took an adverse action on account of his disability; and (4) that the program or activity in question receives federal financial assistance. Id.; see also Cummings v. Norton, 393 F.3d 1186, 1189 (10th Cir. 2005).  Cases decided under section 504 of the Rehabilitation Act are applicable to cases brought under the ADA and vice versa. Roberts v. Progressive Indep., Inc., 183 F.3d 1215, 1220 n.4 (10th Cir. 1999) (internal quotations

5

omitted); see also Wilkerson v. Shinseki, 606 F.3d 1256, 1262 (10th Cir. 2010) (stating "[w]e apply

the standards from the American with Disabilities Act in analyzing a Rehabilitation Act claim").

The ADA defines disability as:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment . . . .

42 U.S.C. § 12102(1).  Impairments that are "transitory and minor" may not be used to support a

"regarded as" claim of disability discrimination under paragraph (1)(C), and an impairment is

transitory if it has an actual or expected duration of six months or less.  42 U.S.C. § 12102(3)(B).

It is plaintiff's burden to establish that he has an actual or perceived disability.  Steele v. Thiokol

Corp., 241 F.3d 1248, 1253 (10th Cir. 2001).

A person is disabled if he has "a physical or mental impairment that substantially limits one

or more major life activities of such individual."  42 U.S.C. § 12102(1)(A).  Major life activities

include, but are not limited to: "caring for oneself, performing manual tasks, seeing, hearing, eating,

sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating,

thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  "A major life activity also

includes the operation of a major bodily function, including but not limited to, functions of the

immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory,

circulatory, endocrine, and reproductive functions."  42 U.S.C. § 12102(2)(B).

In this case, the amended complaint alleges that plaintiff had physical impairments that

substantially limited his ability to perform several major life activities and that CPS "regarded Cline

as having" such "a long-term or permanent" impairment.  Dkt. # 8, at 7.  Due to the "condition of his throat, kidneys, and other organs," plaintiff "could not speak, eat . . . , or care for himself" while in the ICU.  Id. at 4.  Plaintiff "remained unable to work or care for himself" while being treated at LTCA.  Id. at 5.  Throughout the period, plaintiff's physical impairments limited his ability to care for himself, eat, and speak, and major bodily functions were compromised, including functions of the digestive, bladder, and respiratory systems.  Id. at 3-4, 5, 7.  In addition, the amended complaint alleges that "[w]hen [CPS] made the decision to discharge Cline, the expected duration of the impairments was more than six (6) months."  Id. at 7.

The Court finds that the facts alleged in the amended complaint establish the first element of a prima facie case of disability discrimination:  plaintiff alleges that he was a "disabled individual" under 42 U.S.C. § 12102(1)(A) Act because he had physical impairments that substantially limited his ability to perform several major life activities.[3]  Indeed, defendants do not contest that plaintiff was "disabled" under the first element, and the parties' arguments focus on the second element: whether plaintiff was qualified, with or without an accommodation, to perform the essential functions of his job.

"The Rehabilitation Act and the ADA provide relief only to disabled persons who are 'otherwise qualified' to perform the functions of the job."  Wilkerson, 606 F.3d at 1263 (citing 29 U.S.C. § 794(a)).  A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  Adair v. City of Muskogee, 823 F.3d 1297, 1307 (10th Cir. 2016)

---

[3]     Plaintiff also alleged a "regarded as" basis for finding he had a "disability" under 42 U.S.C. § 12102(1)(C).  The first element of a prima facie case is alleged under either definition.

The plausibility of the alleged disability discrimination under the Rehabilitation Act hinges on whether plaintiff was "otherwise qualified" at the time of the alleged discrimination.  The Court must engage in a two step analysis to determine if plaintiff is a "qualified individual."  First, the Court must determine if the plaintiff "can perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue." Hawkins v. Schwan's Home Service, Inc., 778 F.3d 877, 887 (10th Cir. 2015).  The second step of the analysis comes into play if the employee is unable to perform an essential job function, and the Court must consider whether there is any reasonable accommodation that would allow the employee to perform that job function.  Id. at 888.

As to step one, given plaintiff's extensive physical impairments, there is no dispute that plaintiff could not have "perform[ed] the essential functions of the job" without an accommodation. A perfusionist "operates a heart-lung machine, and during surgery maintains blood flow to the patient's tissues and regulates levels of oxygen and carbon dioxide in the blood."  Dkt. # 8, at 2. They play a critical life saving role and must be able to perform in the operating theater.  Plaintiff could not have performed the job while suffering from the physical impairments alleged.  Plaintiff acknowledges as much and asserts that he could have performed "initially with reasonable accommodation," and identifies "job-protected leave" as the accommodation "until he became fully recovered."  Dkt. # 19, at 10 (citing Dkt. # 8, at 6).  Therefore, the Court considers whether, given the facts alleged in the amended complaint, job-protected leave was a reasonable accommodation that could have been offered to plaintiff to allow him to perform all of the essential functions of his job.

The determination of whether a requested accommodation is reasonable is specific to each case, and a court must consider the nature of the employee's disability and the requirements of the job. Punt v. Kelly Servs., 862 F.3d 1040, 1050 (10th Cir. 2017). Paid or unpaid leave for a reasonable period of time may qualify as a reasonable accommodation. See E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028, 1048-49 (10th Cir. 2011) ("We have held that, under the appropriate circumstances, '[a]n allowance of time for medical care or treatment may constitute a reasonable accommodation.'" (quoting Rascon v. USW. Commc'ns, Inc., 143 F.3d 1324, 1333-34 (10th Cir.1998))); see also Hudson v. MCI Telecommc'ns Corp., 87 F.3d 1167, 1169 (10th Cir.1996) ("This court agrees with plaintiff that a reasonable allowance of time for medical care and treatment may, in appropriate circumstances, constitute a reasonable accommodation."). In cases where an employee requests leave as an accommodation, the employee has the burden to produce evidence as to the expected duration of the requested leave to establish when the employee is likely to resume his regular duties. Hudson, 87 F.3d at 1169. "Without an expected duration of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job in the near future and therefore whether the leave request is a 'reasonable' accommodation." Punt, 862 F.3d at 1051 (quoting Cisneros v. Wilson, 226 F.3d 1113, 1129 (10th Cir. 2000)). At this stage, the Court accepts the allegations in the amended complaint regarding the expected duration of plaintiff's impairments as true.

The Tenth Circuit has held that "an employee who isn't capable of working for [six months] isn't an employee capable of performing a job's essential functions—and that requiring an employer to keep a job open for so long doesn't qualify as a reasonable accommodation." Hwang v. Kansas State Univ., 753 F.3d 1159, 1161 (10th Cir. 2014). In Hwang, plaintiff sought more than six months

leave from her employer, and alleged discrimination based on the employer's failure to accommodate the request.  Because the leave sought was an unreasonable accommodation, it meant that plaintiff could not "perform the essential functions of her job" and, therefore, the court concluded that she was not "otherwise qualified."  Id.

In this case, the amended complaint states that "[w]hen [CPS] made the decision to discharge Cline, the expected duration of the impairments was more than six (6) months."[4]  Dkt. # 8, at 7. Therefore, any request for an accommodation of job-protected leave would have been for that length of time and, so, unreasonable under Hwang.

In his response brief, plaintiff asserts "[d]efendants did not give Mr. Cline the opportunity to estimate (or have his physicians estimate) when he would become able to resume work."  Dkt. # 19, at 10.  However, this statement contradicts the fact alleged in the amended complaint that "[w]hen [CPS] made the decision to discharge Cline, the expected duration of the impairments was more than six (6) months."  Dkt. # 8, at 7.  The Court accepts the facts alleged in the amended complaint as true, not arguments contained in a response brief.  According to the Tenth Circuit, six months of leave is not a reasonable accommodation per se.  See Hwang, 753 F.3d at 1161.  Because of the expected duration of his disability, plaintiff's proposed accommodation of job-protected leave

---

[4]     Plaintiff argues that he pleads these allegations "pursuant to his 'regarded as' theory" and they "are made in the alternative only."  Dkt. # 19, at 9.  While plaintiff may plead alternative legal theories, he may not plead alternative sets of facts.  The Court accepts as true all factual allegations in the amended complaint, including that the "expected duration of [plaintiff's physical] impairments was more than six (6) months."  Dkt. # 8, at 7.

would have been for more than six months because of the expected duration of his disability and, therefore, it was not a reasonable accommodation.[5]

For a discrimination claim to survive, plaintiff must allege facts that he was "otherwise qualified" for the position, with or without a reasonable accommodation. Plaintiff required an accommodation, but the facts alleged in the amended complaint preclude the existence of any reasonable accommodation. Therefore, plaintiff could not have been "otherwise qualified" at the time of the alleged discriminatory activity. Because plaintiff cannot state a claim with these facts, the first claim of relief in the amended complaint should be dismissed with prejudice for failure to state a claim upon which relief can be granted.

Oklahoma Anti-Discrimination Act (Count Two)

Plaintiff's second claim for relief (count two) alleges that he was terminated because of his disability and age in violation of the Oklahoma Anti-Discrimination Act (OADA). Dkt. # 8, at 6. Defendants argue that plaintiff cannot state a plausible claim for relief under the OADA for either his disability or age claims. (Dkt. # 11, at 7, 12).

First, the OADA prohibits employers from discriminating against people on the basis of disability. OKLA. STAT. tit. 25, § 1302(A)(1); §1901 (providing a private cause of action for

---

[5]     Plaintiff also argues that his claim should survive the motion to dismiss at this stage because CPS failed to engage in an interactive process to determine whether a reasonable accommodation was available. Dkt. # 19, at 10. An employer's failure to engage in the interactive process is relevant when there is a question as to the existence of a reasonable accommodation. See Dansie v. Union Pacific R.R. Co., 42 F.4th 1184, 1194 n.2 (10thCir. 2022) (stating that "an employee cannot maintain a failure to accommodate claim based solely on an employer's failure to engage in the interactive process," but "[w]hen an employer does not engage in the interactive process" it may be more difficult "to establish the absence of a disputed fact as to the existence of a reasonable accommodation"). CPS's failure to engage in the process is not relevant here, where there was no reasonable accommodation per se because the expected duration of leave was more than six months.

disability discrimination).  Defendants argue that plaintiff's OADA claim fails for the same reasons as his Rehabilitation Act claim.  Dkt. # 11, at 10.  The Tenth Circuit has determined that a plaintiff's OADA claim fails if his federal discrimination claims fail.  See Barzellone v. City of Tulsa, No. 99-5088, 2000 WL 339213, at *5 (10th Cir. Mar. 31, 2000) (unpublished);[6] Anthony v. City of Clinton, No. 98-6188, 1999 WL 390927, at *8 n.6 (10th Cir. June 15, 1999) (unpublished); LeFlore v. Flint Indus., Inc., No. 98-5024, 1999 WL 89281, at *3 n.4 (10th Cir. Feb. 23, 1999) (unpublished) (affirming district court's holding - unchallenged on appeal - that the legal analysis for plaintiff's OADA claim was the same as his ADEA claim); Wilson v. State Ins. Fund ex rel. Okla., No. 96-6100, 1997 WL 12929, at *2 (10th Cir. Jan. 15, 1997) (unpublished) ("[f]or essentially the same reasons set forth in our analysis of the ADA claim, plaintiff's state statutory claims also fail"); see also Stanley v. White Swan, Inc., No.  CIV-00-1291-F, 2002 WL 32061753, at *11(W.D. Okla. Sep. 26, 2002) ("[b]ecause the protections provided by [the OADA] are co-extensive with the protections provided by federal law under the ADA, plaintiff's claim of handicap discrimination in violation of state law fails for the same reasons her federal claim fails").  Therefore, plaintiff's OADA disability discrimination claim fails to state a claim for the same reasons as his Rehabilitation Act claim.

Defendants also argue that plaintiff's OADA age discrimination claim fails to state a claim for relief.  Dkt. # 11, at 12.  The OADA also prohibits employers from discriminating against people on the basis of age.  OKLA. STAT. tit. 25, § 1302(A)(1).  When a plaintiff fails to establish a prima facie case under the ADEA, he fails to establish a claim of age discrimination under the OADA. Bennett v. Windstream Commc'ns, Inc., 792 F.3d 1261, 1269 (10th Cir. 2015); LeFlore, 1999 WL

---

[6]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.

12

89281, at *3 n.4;[7] see also OKLA. STAT. tit. 25, § 1350(F) ( "The defending party may allege any defense that is available under . . . the Age Discrimination in Employment Act . . . ."). Therefore, ADEA jurisprudence governs OADA claims as well.

Generally, to establish a prima facie case of age discrimination, a plaintiff must show: (1) that he is within the protected age group; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) he was treated less favorably than others not in the protected class. Jones v. Oklahoma City Public Schools, 617 F.3d 1273, 1279 (10th Cir. 2010); Stroup v. United Airlines, Inc., 26 F.4th 1147, 1160 n.9 (10th Cir. 2022). The context of a claim and the nature of the adverse action alleged may impact the required prima facie elements and so, alternatively, the Tenth Circuit has also used a similar three-part articulation of the discrimination test: (1) that he is a member of a protected class, (2) that he suffered an adverse employment action, and (3) the challenged action occurred under circumstances giving rise to an inference of discrimination. Bennett, 792 F.3d at 1266; E.E.O.C. v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007). The mixed-motive analysis established in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), does not apply to claims under the ADEA, and a plaintiff asserting an age discrimination claim under the ADEA retains the "burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." Gross v. FBL Financial Servs., Inc., 557 U.S. 167, 177 (2009). The Tenth Circuit has found that Gross is consistent with existing Tenth Circuit precedent, and a plaintiff asserting an age discrimination claim has the burden to prove that "age was the factor that

---

[7]     This and other unpublished opinions are cited for their persuasive value. See 10th Cir. R. 32.1(A).

made a difference," even if age was not the sole motivating factor for an employer's decision. Jones, 617 F.3d at 1277.

"[T]he 12(b)(6) standard does not require that [p]laintiff establish a prima facie case in h[is] complaint, [but] the elements of each alleged cause of action help to determine whether [p]laintiff has set forth a plausible claim." Khalik v. United Air Lines, 671 F.3d 1188, 1192 (10th Cir. 2012). While plaintiff's alleged facts may support a prima facie case using either articulation of the elements, they fail to support an inference that age was the "factor that made a difference" in his termination. Plaintiff was: (1) sixty-one (61) at the time of the events and therefore in a protected class (above the age of forty (40)); (2) terminated from employment; and (3) qualified to be a perfusionist. Dkt. # 8, at 11. He alleges that he was the only person terminated that year, while two "far younger" and "far less qualified and far less experienced" employees were hired to replace him. Id. at 5, 11. The amended complaint, however, alleges that plaintiff's disability was the determinative factor in his termination. There may, of course, be multiple factors that lead to a plaintiff's termination but, to allege age discrimination as one of them, plaintiff's age must be a "but for" factor. Nothing in plaintiff's amended complaint satisfies that requirement or demonstrates the causal connection between plaintiff's age and his termination. Plaintiff must allege facts that support an inference that his age was a factor the contributed to the decision to terminate him. The facts in the amended complaint allege that plaintiff was terminated because of his inability to perform his duties as a perfusionist due to his disability.

The Court finds that plaintiff has not alleged a plausible claim of age discrimination, because the facts alleged do not create an inference that age was a but-for factor in the decision to terminate

his employment. Because plaintiff cannot state a claim for relief under these facts, plaintiff's second claim for relief in the amended complaint should be dismissed with prejudice.

Affordable Care Act Claim (Count Three)

Plaintiff's third claim for relief (count three) is that CPS discriminated against him because of his disability in violation of the Affordable Care Act (ACA). Dkt. # 8, at 12-14. Defendants argue that plaintiff cannot state a plausible claim for relief under the ACA. Dkt. # 11, at 12.

Section 1557 of the ACA prohibits certain discrimination by entities that receive federal financial assistance. 42 U.S.C. § 18116. Plaintiff argues this prohibition applies to workplace discrimination because of disability. Dkt. # 8, at 13. The ACA adopts the relevant provisions of the Rehabilitation Act:

> Except as otherwise provided for in this title . . . , an individual shall not, on the ground prohibited under . . . section 794 of Title 29 [section 504 of the Rehabilitation Act], . . . be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, . . . . The enforcement mechanisms provided for and available under . . . [section 504 of the Rehabilitation Act] . . . shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a). Defendants argue that the applicability of the ACA's nondiscrimination provision to employment discrimination "is at best unclear," and cite to regulations that limit its scope. Dkt. # 11, at 11.

The Court need not decide that question here, however, because, assuming the ACA's nondiscrimination provision does apply to this case, plaintiff fails to state a plausible claim. The Court uses the same analytical framework for a claim for relief under the ACA as it does for the Rehabilitation Act. See Francois v. Our Lady of the Lake Hosp., Inc., 8 F.4th 370, 378 (5th Cir. 2021) ("For disability-discrimination claims, the ACA incorporates the substantive analytical

framework of the [Rehabilitation Act.]"); Doe v. BlueCross BlueShield of Tennessee, Inc., 926 F.3d 235, 239 (6th Cir. 2019) ("[T]he Affordable Care Act picks up the standard of care for showing a violation of § 504 [of the Rehabilitation Act.]").  Since plaintiff cannot allege facts to state a claim for relief under the Rehabilitation Act, plaintiff also cannot state a claim for relief under the ACA.  Therefore, plaintiff's third claim of relief should also be dismissed with prejudice.

Breach of Contract (Count Four)

Plaintiff's fourth claim for relief (count four) is that CPS's termination of Cline breached their contract.  The employment contract between plaintiff and CPS contained a terminable at will provision, permitting termination of the contract by either party with 30 days written notice.  Dkt. # 11-1, at 3.  Plaintiff argues his termination was done in bad faith, which breaches the implied covenant of good faith and fair dealing.  Defendant argues that plaintiff fails to state a plausible claim for breach of contract.  Dkt. # 11, at 15.

The Oklahoma Supreme Court has considered a principal's bad faith invocation of a terminable at will clause.  Hall v. Farmers Ins. Exch., 713 P.2d 1027, 1029 (Okla. 1985) ("The primary issue . . . is whether a party to a contract which is terminable at will, upon notice, may be held liable for damages if such termination is done in bad faith.").  While the court held that "[t]he implied covenant of good faith extends to a covenant not to wrongfully resort to the termination-at-will clause," id. at 1030, damages were limited to the "fruits of his contract."  Id. at 1031.

Hall is a unique case that has been limited to its facts, and the Oklahoma Supreme Court has since clarified its holding to be that "a principal may not resort to the termination-at-will clause of an agency agreement for the purpose of depriving its agent of the 'fruits of his labors.'"  Blanton v.

16

Hous. Auth. of City of Norman, 794 P.2d 412, 417 (Okla. 1990).  See also Hinson v. Cameron, 742

P.2d 549, 552 (Okla.1987) (stating "Hall . . . stands for the rule that an agent may recover from the

principal when the latter has, in bad faith, deprived him of the fruit of his own labor").  Hall did not

create a "new cause of action in favor of an at-will employee discharged in 'bad faith,'" Hinson, 742

P.2d at 552, and the Hinson court expressly declined to impose upon the employer a legal duty not

to terminate an at-will employee in bad faith."  Id. at 554.

       The fruits of one's own labor is limited to what the plaintiff already earned.  While the court

in Hall permitted damages for future income, it was based only on properly anticipated renewals for

policies that plaintiff had already sold and secured.  See Hall, 713 P.2d at 1031.  Damages for future,

unearned income are not permitted:

>       In Hall, the agent sought to recover the true fruits of his labor, commissions owed to him
>       based on his pre-termination employment. [Plaintiff] is clearly seeking to recover for future,
>       unearned income. Therefore, the holding in Hall is not applicable to this case and we will not
>       extend such a remedy to the case where one seeks to recover future, unearned income.

Blanton, 794 P.2d at 417; see also, Hinson, 742 P.2d at 552 (finding the case distinguishable from

Hall because "Hinson [did] not claim[] the [employer] deprived her of any earned income").

       Plaintiff argues that, unlike the plaintiffs in Blanton or Hinson, he was not an employee at

will but a contract employee and therefore those decisions are inapplicable.  However, Hall was also

a contract employee, but the contract had a terminable at will clause, just like the one in Cline's

contract with CPS.  Even if plaintiff is not an employee at will, in the termination of employment

contracts, Oklahoma courts have applied the same rule and held that "recovery is allowed for the bad

faith breach of the employment contract only upon a showing of some 'intent to wrongfully deprive

17

[a contracting party] of the fruits of his contract.'" Robinson v. Southerland, 123 P.3d 35, 44 (Okla. Civ. App. 2005) (quoting Hall, 713 P.2d at 1030).

Plaintiff does not claim CPS deprived him of any earned income in this case.  Instead, plaintiff asserts the "fruits of his contract" include "his right to continue earning compensation and to continue enjoying his chosen profession" (Dkt. # 19, at 15), but those "fruits" are not like any that Oklahoma has recognized for breach of an employment contract that is terminable at will upon notice.  Therefore, plaintiff cannot state a plausible claim for breach of contract under these facts and plaintiff's breach of contract claim should be dismissed with prejudice.

Tortious Interference (Count Five)

Plaintiff's fifth claim for relief (count five) is that defendants Esau and McKeon tortiously interfered with plaintiff's employment contract with CPS.  Dkt. # 8, at 15.  Defendants argue that plaintiff fails to state a claim because defendants Esau and McKeon were, as representatives of CPS, parties to the contract and, therefore, could not have committed tortious interference.  Dkt. # 11, at 17.

Under Oklahoma law, a tortious interference claim has four elements:  "(1) the interference was with an existing contractual or business right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage."  Wilspec Techs., Inc. v. DunAn Holding Grp., Co., 204 P.3d 69, 74 (Okla. 2009) (citing Mac Adjustment, Inc. v. Prop. Loss Res. Bureau, 595 P.2d 427, 428 (Okla. 1979)).  "Additionally, the claim is viable only if the interferor is not a party to the contract or business relationship." Wilspec Techs., Inc., 204 P.3d at 74 (citing Voiles v. Santa Fe Minerals, Inc., 911 P.2d 1205, 1209 (Okla. 1996)).

18

"A cause of action for wrongful interference with contract can arise only when one who is not a party to a contract interferes with that contract by convincing one of the contracting parties to breach its terms." Ray v. Am. Nat. Bank & Tr. Co. of Sapulpa, 894 P.2d 1056, 1060 (Okla. 1994). An agent "cannot be liable for wrongfully interfering with a contract if [the agent] was acting in a representative capacity for a party to that contract." Voiles, 911 P.2d at 1210 (citing Ray, 894 P.2d at 1060). If Esau and McKeon acted as agents to CPS, then, as a matter of law, they could not have interfered with the contract.[8]

Esau and McKeon own CPS and hold all of CPS's shares of stock. Dkt. # 8, at 3. When they terminated Cline, they did so on behalf of CPS, and so acted as agents of CPS. Because defendants Esau and McKeon acted as CPS's agents when they terminated Cline's employment, they were, in their representative capacity of CPS, party to the contract. Therefore, there is no plausible claim for tortious interference.

Plaintiff argues that, because the corporation is a separate legal entity, its shareholders are third parties that can tortiously interfere with its contracts. Dkt. # 19, at 24-25. That may be in some cases but it still requires a finding that the alleged interferor is not a party or not representing the corporation. See Positive Cashflow, Inc. v. Response Team 1 Holdings, LLC, No. 118,946, slip op. at 15 (OK Civ. App. June 6, 2022) (upholding liability against a parent corporation only after finding that the defendant "was not a party to [its subsidiary corporation's] contracts, and there was

---

[8]      Plaintiff argues that an agent can be liable for tortious interference "if the agent was acting against the interests of the principal (employer) and in furtherance of the agent's own interests." Dkt. # 19, at 26 (citing Martin v. Johnson, 975 P.2d 889 (Okla. 1998)). Martin addressed rogue agents and whether there is personal liability "if the agent was acting against the interests of the principal and in furtherance of interests of the agent." Martin, 975 P.2d at 896. It is inapplicable to this case, where, as owners of CPS, Esau and McKeon's interests are aligned with CPS's.

no evidence that [defendant parent corporation] was acting in a <u>representative capacity</u> for [the subsidiary corporation]") (emphasis in original).  As stated, Esau and McKeon were acting for CPS in their representative capacity as the owners and operators of CPS and so they could not tortiously interfere with CPS's contract with plaintiff.  Because plaintiff cannot state a claim for relief under these facts, plaintiff's tortious interference claim against defendants Esau and McKeon should be dismissed with prejudice.

<u>Intentional Infliction of Emotional Distress (Count Six)</u>

Plaintiff's sixth claim for relief (count six) is that, under the circumstances, defendants' conduct was "so extreme and outrageous as to go beyond all possible bounds of decency and would be considered atrocious and utterly intolerable in a civilized society" that it constitutes outrageous conduct, or intentional infliction of emotional distress (IIED).  Dkt. # 8, at 16.  Defendants argue that plaintiff's claim should be dismissed because the "conduct alleged does not rise to the level of extreme and outrageous conduct necessary for an IIED claim."  Dkt. # 11, at 14.

Oklahoma courts have recognized a cause of action for intentional infliction of emotional distress, also known as the tort of outrage.  <u>See</u> <u>Gaylord Entertainment Co. v. Thompson</u>, 958 P.2d 128, 149 (Okla. 1998).  The action is governed by the narrow standards laid out in the Restatement Second of Torts, § 46.  <u>Id.</u>  In <u>Breeden v. League Services Corp.</u>, 575 P.2d 1374 (Okla. 1978), the Oklahoma Supreme Court explained:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'  The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

Id. at 1376.  To state a claim, a plaintiff must allege that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." Schovanec v. Archdiocese of Oklahoma City, 188 P.3d 158, 175 (Okla. 2008) (quoting Computer Publications, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002)).  Under Oklahoma law, the trial court must assume a "gatekeeper role" and make an initial determination that the defendant's conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards." Trentadue v. United States, 397 F.3d 840, 856 n.7 (10th Cir. 2005) (applying Oklahoma law).  If reasonable persons could reach differing conclusions in the assessment of the disputed facts, the Court should submit the claim to the jury to determine whether the defendant's conduct could result in liability.  Id. The Court is to make a similar threshold determination with regard to the fourth prong, the presence of severe emotional distress.  Id.

In cases arising out of the workplace, Oklahoma appellate courts have found that a defendant engaged in extreme and outrageous conduct only when that defendant intentionally and persistently engaged in a course of conduct that harmed the plaintiff.  See Computer Publications, 49 P.3d at 736 (claim should have been submitted to a jury when plaintiff presented evidence that harassment lasted more than two years and caused plaintiff to quit her job, move, and repeatedly change phone numbers); Miner v. Mid-America Door Co., 68 P.3d 212 (Okla. Civ. App. 2002) (employer's alleged failure to reassign the plaintiff after learning of workplace harassment, even if unreasonable, was not extreme and outrageous); Gabler v. Holder & Smith, Inc., 11 P.3d 1269 (Okla. Civ. App. 2000) (noting that workplace harassment rarely rises to the level of extreme and outrageous conduct); Mirzaie v. Smith Cogeneration, Inc., 962 P.2d 678 (Okla. Civ. App. 1998) (employer's conduct was

not extreme and outrageous when, inter alia, the plaintiff's manager made derogatory sexual remarks about the plaintiff, woke plaintiff up in the middle of the night to do unnecessary work, and terminated him two hours before his wedding); Zahorsky v. Community Nat'l Bank of Alva, 883 P.2d 198 (Okla. Civ. App. 1994) (employer not liable for intentional infliction of emotional distress when an employee forced the plaintiff to have sex with him and employer failed to fire the employee, even though the employer allegedly knew about the conduct).

Plaintiff has not alleged that defendant engaged in extreme and outrageous conduct, and defendants' motion to dismiss on plaintiff's claim of intentional infliction of emotional distress should be granted.  There is no allegation that defendants engaged in a pattern of consistent and severe conduct.  Instead, the alleged "outrageous" conduct is simply that, after plaintiff had spent more than five weeks in the ICU and was being transferred to an in-patient rehabilitation facility, defendant terminated plaintiff's employment when it was expected that plaintiff would not be able to work for at least six more months.  The facts of this case do not rise to the level of extreme and outrageous conduct under Oklahoma law, and plaintiff's response to defendant's motion for summary judgment makes no argument as to the viability of this claim.[9]  Under the facts alleged, Esau and

---

[9] Plaintiff asks the Court to follow cases from other jurisdictions which permitted IIED claims against employers; however, the facts of those cases are clearly distinguishable from this one. In Stock v. Graham, 125 N.S. 564 (N.M. App. 1998), the employer fired plaintiff at her hospital bedside.  The court allowed it to continue because more information was needed about the nature of the interaction between defendant and plaintiff at the hospital, which did not occur in this case.  In Richardson v. Valley Asphalt, Inc., 109 F. Supp. 2d 1332 (D. Utah 2000), the employer's alleged discriminatory conduct could form the basis of an IIED claim "if performed with the requisite intent."  Id. at 1340.  However, plaintiff's amended complaint fails to allege facts to support that defendants had the requisite intent for an IIED claim when they terminated him.

McKeon's conduct was not "extreme and outrageous."  Therefore, plaintiff's claim for outrageous conduct should be dismissed with prejudice.

**IT IS THEREFORE ORDERED** that defendants' motion to dismiss (Dkt. # 11) is **granted**. All six of plaintiff's claims for relief are dismissed with prejudice because plaintiff cannot state any of the claims under the facts alleged.  A separate judgment of dismissal is entered herewith.

**DATED** this 28th day of October, 2022.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE